In re PALM BEACH CRUISES,
S.A., Debtor.

Bankruptcy No. 95–33516–BKC–SHF.

United States Bankruptcy Court,
S.D. Florida.

April 23, 1997.

Chad Paiva, for Debtor.

Craig Rasile, for Shell Oil Co.

### ORDER ALLOWING FEES

STEVEN H. FRIEDMAN, Bankruptcy Judge.

After notice to all creditors, and upon consideration at a hearing held on January 29, 1997, this Court, having carefully considered the pending fee applications, finds that the following allowances are reasonable.

The Court finds that reasonable compensation for Rogers & Wells ("R & W") is $272,769.00 plus expenses of $87,716.13.

The Court finds that reasonable compensation for Ruden, McClosky, Smith, Schuster & Russell, P.A. ("RMSSR") is $65,770.50, plus expenses of $35,697.29. RMSSR received a retainer of $10,000.00 at the commencement of this case, and thus is awarded net compensation of $55,770.50, plus expenses of $35,697.29.

The Court finds that reasonable compensation for Sale & Kuehne, P.A. ("S & K") is $27,720.00 plus expenses of $2,223.43.

The Court finds that reasonable compensation for Arsht & Company, Inc. ("Arsht"), financial adviser for the Debtor, is $47,300.00 plus expenses of $21,133.80, all of which here-

tofore has been paid during the course of this chapter 11 proceeding. Thus, the Court finds that no further compensation shall be paid to Arsht.

## OVERVIEW OF BANKRUPTCY PROCEEDING

The Debtor's tortuous path to confirmation of its liquidating chapter 11 plan began on October 30, 1995 with the filing of its voluntary chapter 11 petition. At the commencement of this case, the Debtor owned and operated the M/V Viking Princess, a cruise ship operated from the Port of Palm Beach, together with related assets. The Debtor utilized the Viking Princess to operate day cruises off of the Florida coastline, and also, day and overnight cruises to Freeport in the Bahamas. The Debtor generated revenues both from the fares charged passengers, and from gambling revenues generated on board. The Debtor listed the book value for the Viking Princess at $12 million, and listed related assets, including accounts receivable and pending causes of action, at $5 million.

The Viking Princess was subject to a First Preferred Ship's Mortgage held by Den norske Bank of New York City for approximately $2 million. In addition, the Debtor listed the United States of America/Department of Justice as a secured creditor for approximately $335,000.00. Among the other more prominent creditors participating in this case were the Port of Palm Beach District, the Freeport Harbour Company, the Department of the Treasury/Internal Revenue Service and the State of Florida/Department of Revenue, K/S Granada, Banque Internationale A Luxembourg, and GMO Travel, Inc., Cheney Brothers, Inc., Oddmund R. Grunstad, Dag Grunstad, and Grunstad Terminals, Inc. ("Grunstad Entities").

At the commencement of this case, the Debtor harboured hopes of revitalizing the Debtor's operation through a substantial cash infusion.[1] The Debtor operated throughout the first several months of this case without significant challenge or opposition from its creditors, as it explored strategies for revamping the Debtor's marketing approach and financial structure. On April 10, 1996, the Court approved a proposal whereby the Debtor purchased the casino and business equipment on board the Viking Princess from the Grunstad Entities and Caribbean Amusement Company, Ltd. ("CAC"), and subject to a security interest held by the Grunstad Entities and CAC (over the objections of various creditors). On April 10, 1996, this Court authorized the Debtor to borrow approximately $500,000.00 from Den norske Bank in conjunction with the operation of the Viking Princess. After the granting of several extensions of the Debtor's exclusivity to file a plan, the Debtor ultimately filed a plan of reorganization on May 30, 1996, proposing a sale of the Viking Princess and related assets. The subsequently filed First Amended Plan (filed July 18, 1996), Second Amended Plan (filed August 18, 1996), Third Amended Plan (filed November 5, 1996), and Fourth Amended Plan (filed November 5, 1996 and approved December 18, 1996) all provided for the liquidation of the Viking Princess and related assets.

On December 18, 1996, this Court approved the sale of the Viking Princess and related assets to Leo Equity Group, Inc. ("LEG") for $5.6 million, of which $4,950,000.00 has been paid in cash, and of which the remaining $750,000.00 is to be paid in December, 1997. The Court is advised by counsel for the Debtor that, subsequent to payment of allowed priority claims and maritime lien claims, and assuming full receipt of the $750,000.00 due from LEG, the administrative fee applicants will receive only a ten (10%) percent pro rata distribution upon their respective fee requests.[2] Thus, it is

---

1. Although Arsht was retained ostensibly as a financial analyst to "make recommendations regarding possible restructuring scenarios", it is evident from the record that the primary function of Arsht was in the role of an investment banker, to raise new capital for the Debtor. To this end, Arsht expended substantial effort in preparing a private placement memorandum, but Arsht was wholly unsuccessful in raising new capital for the Debtor.

2. Pursuant to the Fourth Amended Plan of Reorganization, Administrative Expense Claims which include the pending fee requests, were to

apparent that this estate will have been administered for the benefit of lienholders and administrative claimants, including fee claimants, with the only ostensible benefit to other interested persons being that the jobs of the ship's employees have been salvaged, for the moment, with the transfer of the Viking Princess to its new owner, and with its continued operation.

### FEE APPLICATIONS OF ROGERS & WELLS

The R & W fee application seeks an award of compensation in the amount of $429,035.90, together with reimbursement of expenses in the amount of $87,716.13. As noted above, this Court has deemed it appropriate to reduce the R & W fee request to $272,769. The bases justifying the reduction fall within two categories: (1) adjustments to account for excessive hourly rates; and (2) adjustments to account for excessive and/or unproductive time entries.

#### Adjustment to Requested Hourly Rate

 The R & W fee application seeks compensation at hourly rates ranging from $245.00 per hour to $420.00 per hour for attorneys, and from $60.00 per hour to $110.00 per hour for paraprofessionals. In its fee application, R & W represents that the hourly rates of its attorneys and paraprofessionals are comparable with hourly rates charged by other experienced bankruptcy practitioners in the Southern District of Florida, and are within the hourly rate structure customarily awarded by this Court in similar cases. This Court disagrees with the conclusion drawn by R & W. This Court does not doubt that R & W enjoys an excellent nationwide reputation and that the firm is highly experienced in the field of bankruptcy reorganizations. However, under the circumstances of the instant case, this Court concludes that R & W is limited in the hourly rate for which compensation can be sought to rates ordinarily charged by highly experienced bankruptcy counsel in the Southern District of Florida.

 As a general rule, the term "reasonable hourly rate" has been defined as "the hourly amount to which attorneys in the area would typically be entitled for a given type of work on the basis of an hourly rate of compensation." *Jorstad v. IDS Realty Trust,* 643 F.2d 1305, 1313 (8th Cir.1981), quoting *City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 471 (2d Cir.1974). As noted by the bankruptcy court in the decision of *In re Liberal Market, Inc.,* 24 B.R. 653 (Bankr. S.D.Ohio 1982):

> The basic litmus test for professional fees is the average rate charged by "local" professionals for similar work. The practical concept of locality, however, may vary upon the volume and difficulty of the work involved in a particular case. In determining the average attorney fees, the "local bar" in an area of law necessitating both specialization and large volume work may bear only remote relation to the immediate geographic locality. Rather, if a case requires expert opinion, the fee for such service should be measured by the average charged by "local experts", meaning those experts typically consulted for assistance in geographically local matters.

*Id.* at page 659.

 Based upon this Court's familiarity with hourly rates charged by experienced bankruptcy practitioners in other cases pending in the Southern District of Florida, together with a consideration of other fee applications pending in this case, the hourly rates sought by R & W are excessive. In reaching the foregoing conclusion, this Court has considered the fees recently awarded in the successful chapter 11 case of *Del Tura Development Co.,* Case No. 96–31655–BKC–SHF,[3] the successful chapter 11 case of *Israel Marmol & Associates, Inc.,* Case No. 96–

---

be paid in full, in cash. The plan also provides that the Class I Claimants (holders of allowed priority claims) and the Class III Claimants (holders of allowed maritime lien claims) also are to be paid full. However, counsel for the Debtor have represented that they shall subordinate payment of fees and expenses awarded to

them to payment of allowed Class I and Class III claims.

3. The hourly rates awarded in the *Del Tura Development Co.* case range from $200.00 per hour for time expended by associates to $325.00 per hour for time expended by senior partners.

12210–BKC–SHF [4] and the fees awarded in the case of *Telecom America, Inc.*, Case No. 95–34145–BKC–SHF, relating to hotly contested litigation between parties represented by experienced bankruptcy counsel.[5] *Sub judice*, this Court determines that the maximum hourly rate to be awarded to R & W is $300.00 per hour (for time expended by its senior partners, Messrs. Drebsky and Feder) and that the maximum hourly rate to be awarded for time expended by associate attorneys of R & W (predominantly, Steven Quine) is $200.00 per hour. In addition, based upon this Court's afore-mentioned review of rates charged for paraprofessionals in similar cases, this Court determines that the maximum hourly rate chargeable for paraprofessional services relating to the rendition of legal services in a bankruptcy proceeding is $75.00 per hour. By making adjustments to the R & W fee application to account for the reduction in hourly rates, the maximum amount awardable to R & W (prior to further reductions by this Court for excessive or unproductive time entries) equals $307,829.00.

### *Deletion of Excessive or Unproductive Time Entries*

Based upon the Court's review of the time itemization appended to R & W's fee application, further adjustments are mandated for unproductive time entries and for excessive time entries. The Court has identified 73 R & W time entries as to which a reduction or deletion is warranted. The Court will not identify each of the itemizations, but rather, will comment generally on the rationale for the adjustment or deletion.

■ Some of the time entries reflected in the R & W fee application include travel time incurred by counsel to travel from New York City to West Palm Beach. While under some circumstances, this Court acknowledges that travel time can be properly compensable, it is not warranted here. The Debtor was represented not only by R & W, but also by RMSSR of Fort Lauderdale, Florida. Most of the numerous hearings in this case were attended both by R & W attorneys and by RMSSR. With the retention of the Debtor by two law firms to represent it in this liquidating chapter 11 proceeding, and particularly considering the high level competence of RMSSR, the Court determines that R & W's request to be compensated for travel time is inappropriate.

■ The Court also has made downward adjustments to time entries by R & W attorneys to the numerous time entries relating to preparation of the private placement memorandum utilized by the Debtor in its ill-fated efforts to recapitalize the Debtor. A private placement was never effectuated by the Debtor, and thus, such time expenditures did not benefit the estate. The Court has made similar downward adjustments for entries relating to fiduciary issues, management incentive compensation, and tax planning.

■ Another category of time entries viewed as suspect by the this Court involve the numerous telephone conferences between counsel for R & W and counsel for RMSSR. Most of the suspect time entries encompass a dissemination of new information between counsel, which telephone conferences obviously would not have occurred if the Debtor was represented by a single law firm.

■ Further justifying the reduction of the R & W fee request are the numerous entries by paraprofessionals for charges which this Court deems to be encompassed in a law firm's overhead. Such entries are described by R & W as "administrative/clerical", "mailing/production of documents", and "copied and sent documents". As with the other categories of time entries in the R & W fee application justifying the reduction of the fee award to R & W, the Court has not specifically delineated each of the time entries by paraprofessionals which the Court

---

4. The hourly rates awarded in the Israel Marmol & Associates, Inc. case range from $160.00 per hour for time expended by associates to $310 per hour for time expended by senior partners.

5. Although the litigation relating to the Telecom America, Inc. case derives from recently concluded adversary proceedings filed by bankruptcy trustees, the counsel representing the trustees in this complicate litigation were awarded hourly rates of between $150.00 per hour and $300.00 per hour, with time expended by paraprofessionals compensated at rates of between $75.00 per hour and $85.00 per hour.

deems to be encompassed within R & W's overhead. Such an explicit delineation will be provided upon request.

### FEE APPLICATION OF RUDEN, MCCLOSKY, SMITH, SCHUSTER & RUSSELL, P.A.

■ The downward adjustment to the fee request of RMSSR is relatively minor in comparison to the reductions to the R & W fee application. The Court notes that the hourly rates requested by the attorneys of RMSSR range between $160.00 and $270.00, and between $100.00 and $115.00 for paraprofessionals. Compensation for the time expended by paraprofessionals has been adjusted to reflect the allowance of a maximum hourly rate for paraprofessionals of $75.00. As with the R & W fee application, the Court has reduced some of the RMSSR time entries relating to telephone conferences between RMSSR attorneys and R & W attorneys as being unnecessary. Additional adjustments are warranted based upon duplication of efforts as between RMSSR and R & W.

■ Most of the disallowed time entries relate to the services rendered by Glen A. Stankee. Mr. Stankee apparently expended substantial efforts in the preparation of the private placement memorandum, and in consideration of tax planning and the structuring of investment vehicles through which the Debtor was to raise capital. Not only did such efforts ultimately prove unproductive, but these efforts are duplicative of the substantial time expenditures by R & W, and thus, appear to have been wholly unnecessary.

> Whenever a bankruptcy court reviews fees pursuant to § 330, it must consider the benefit, if any, a professional provides to the debtor's estate. Indeed, it is common for a bankruptcy court to reduce fees and costs where the court perceives only a middling benefit to the estate.

*In re St. Vrain Station Co.,* 151 B.R. 549 (D.Col.1993). (Citations omitted).

### FEE APPLICATION OF ARSHT & COMPANY, INC.

■ The application of Arsht & Company, Inc. seeks aggregate compensation in the amount of $311,279.55. As note above, this Court's award of $47,300.00 in fees and $21,133.80 as reimbursement of expenses is identical to the amount of fees and expenses paid to Arsht during the course of this chapter 11 proceeding, and as such, no further fees or expense reimbursement will be received by Arsht. A brief review of Arsht's involvement in this case is appropriate.

The Debtor filed its initial request for permission to employ Arsht on November 8, 1995, nine days after the commencement of this case. The terms of engagement as initially proposed by the Debtor provided that Arsht was to receive a $15,000.00 monthly retainer plus out-of-pocket expenses together with a $100,000.00 restructuring fee upon the Debtor's emergence from chapter 11, and an incentive fee of $150,000.00 upon the restructuring of the Debtor's obligations, whether via a confirmed plan of reorganization or otherwise. It is noteworthy, for purposes of the instant order, that in substantiation of its request to employ Arsht, the Debtor cites to numerous instances wherein Arsht had been successful in obtaining financing for many of its clients, raising hundreds of millions of dollars. Thus, while Arsht may have been dubbed the Debtor's "financial adviser", the clear purpose of the initial application for retention, as well as all subsequently filed applications for retention, was to employ Arsht to raise capital for the Debtor. The Debtor's initial application for retention was denied, on the basis, among other reasons, that Arsht would not be disinterested, as Arsht conceivably was to become an equity investor in the reorganized Debtor. In addition, Arsht was to receive bonuses of up to $290,000.00 if a plan conceived by Arsht and financed through Arsht's efforts, ultimately was accepted and approved. Hence an amended application to employ Arsht was filed on December 21, 1995, and was heard on an expedited basis. This second application to employ Arsht also was denied at a hearing held on December 28, 1995. At that hearing, the Court addressed the terms

which it would require in order to approve the retention of Arsht. Ultimately, the Court approved Arsht's retention on January 17, 1996.

Pursuant to the terms of the January 17th Order, Arsht was retained "... to assist the Company (the debtor) in analyzing its present financial condition, make recommendations regarding possible restructuring scenarios, and assist in financing, if appropriate, a plan of reorganization." For its services, Arsht was to receive a monthly fee of $10,000.00 (as opposed to the $15,000.00 per month fee initially proposed), and it was further provided that Arsht would earn an incentive fee, in an amount to be determined by the Court, "... based on the total equity commitments obtained for the Company as part of a plan confirmed by the Court." Arsht further agreed to assist the Debtor in preparing a private placement memorandum, solicit equity investors, and consult with creditors and the Debtor regarding the Debtor's financial condition.

In its fee application, Arsht attaches time logs evidencing an expenditure of 2,210 hours by its principal, Allan Arsht, and by the employees of Arsht, in providing financial services to the Debtor. The Court has no reason to question the representations of Arsht concerning the expenditure of time on behalf of the Debtor. However, other than the $10,000.00 monthly fee to be paid to Arsht approved by this Court pursuant to the Court's January 17, 1996 Order, Arsht was to be paid **not** for **time expended, but** for **results obtained.** Simply put, there **were no results** (of a positive nature). This Court's January 17, 1996 Order, which provides that Arsht may apply upon confirmation of a plan of reorganization for an additional $5,000.00 per month in compensation over the term of the engagement as well as an incentive fee, clearly contemplates that Arsht would be successful in assisting the Debtor to obtain a substantial infusion of fund. Rather, the Debtor both literally and figuratively struggled to stay afloat, and it was only through cash advances by Wasatch International Corp., a suitor, and thereafter, by Leo Equity Group, Inc., the ultimate purchaser of the Viking Princess, that the Debtor was able to "keep its head above water" until the Debtor's assets were liquidated at sale on December 18, 1996. Although Arsht appeared to have ably performed its duties as the Debtor's investment adviser, its "fishing expedition" to secure a substantial cash infusion to rehabilitate this Debtor proved unsuccessful. Arsht should not now reap additional benefit notwithstanding an unsuccessful catch. Accordingly, additional compensation in favor of Arsht over and above the compensation previously authorized and paid, is **denied.**

### FEE APPLICATION OF SALE & KUEHNE, P.A.

█ The fee application of Sale & Kuehne, P.A. seeks compensation for services rendered in the amount of $27,720.00 plus reimbursement of expenses in the amount of $2,223.43. The services provided by S & K relate solely to representation of the Debtor in defense of the criminal proceeding filed by the United States of America, alleging illegal discharge of oil and certain other waste matter into the Atlantic Ocean. Ultimately, the Debtor accepted a guilty plea and was placed on probation, conditioned upon payment of a criminal fine of $500,000.00, the posting of performance bond of $100,000.00, and the implementation of an environmental compliance program. The services provided by S & K were necessary to the operation of the Debtor, particularly since the Debtor could have received a much harsher sanction for the alleged criminal violations. The hourly rate sought by S & K, as experienced criminal counsel, is $275.00 per hour, and the Court finds the hourly rate to be reasonable. Compensation is thus awarded in favor of Sale & Kuehne, P.A. in the amount of $27,720.00 together with out-of-pocket expenses in the amount of $2,223.43.

**ORDERED**